IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL LUCAS,

    Petitioner,                      No. CIV S-08-1203 LKK DAD P

    vs.

STEVE MOORE, et al.,

    Respondents.                FINDINGS & RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges the decision of the California Board of Parole Hearings (hereinafter "Board") to deny him parole for one year at a parole suitability hearing held on May 16, 2007. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

        On September 8, 1982, an Orange County Superior Court jury convicted petitioner of first degree murder with use of a firearm. (Form Pet. at 2.) The trial court sentenced petitioner to an indeterminate term of twenty-seven years to life in state prison. (Id.)

        The parole consideration hearing which is placed at issue in the instant petition was held on May 16, 2007. (Answer, Ex. 1 at Ex. C) (hereinafter "Decision"). On that date, a

Board panel found petitioner not suitable for parole and denied him release on parole for one year. (Id.) Petitioner challenged the Board's decision in a petition for writ of habeas corpus filed in the Orange County Superior Court on January 16, 2008. (Answer, Ex. 1.) The Superior Court rejected petitioner's claims in a reasoned decision on the merits. (Answer, Ex. 2.)

On February 26, 2008, filed a petition for writ of habeas corpus in the California Court of Appeal for the Fourth Appellate District. (Answer, Ex. 3.) That petition was summarily denied by order dated February 28, 2008. (Answer, Ex. 4.) Petitioner subsequently filed a petition for review in the California Supreme Court, which was summarily denied by order dated April 30, 2008. (Answer, Exs. 5 & 6.)

On June 2, 2008, petitioner commenced this action by filing a federal petition for writ of habeas corpus.

## FACTUAL BACKGROUND

The Board described the facts of petitioner's offense at the May 16, 2007 parole suitability hearing as follows:

> Records of the Westminster Police Department reflect that on October 10th, 1981 at approximately 11:37 p.m., officers were dispatched to an industrial complex located at 7125 Fenwick, spelled F-E-N-W-I-C-K, to investigate the occurrence of a probable homicide. Upon arrival at the location contact was made with the security guard who related that while making his rounds, he observed a pickup truck to be backed into one of the parking stalls and that both of the doors to the vehicle were open. He added that he shined his spotlight on the vehicle and observed the body of a male subject, later identified as 25 year old Van Hecke, to be lying in a pool of blood beside the vehicle.
>
> It was determined that the victim had suffered at least two gunshot wounds to the torso and he had been dead since approximately 9:00 p.m. A considerable amount of blood was discovered at the scene, it was traced to a second pool of blood located approximately two feet east of the original one. Also, a company pickup truck was located approximately 25 feet west of the victim's vehicle and a large amount of blood was located on the front fender and hood, and another pool of blood was located six feet in front of the truck. A third pool of blood was located approximately 12 feet northwest of the victim's vehicle. Also, the officers noted that the glove box of the victim's vehicle was open,

the brake was set, the hood and tires were cold to the touch and that the key was not in the ignition.

An autopsy was subsequently conducted and four gunshot wounds were evident from the victim's body.  It was ascertained that the . . . victim had been shot in the back in a downward trajectory, once in the chest, upward trajectory, and once to the left kneecap, downward trajectory, and once to the right temple of the head, downward trajectory.  A .38 caliber slug was removed from the victim's left leg and another one was removed from his throat.  Hemothorax was determined to be the cause of death.

During the course of the subsequent investigation it was established that the victim was an employee of the Red Mustache Hair Salon, and that he had told another employee that he was going to sell an ounce of cocaine to an individual, later identified as Mr. Lucas, on that particular evening.  The witness added that he was aware that the victim had, on previous occasions, sold cocaine to Mr. Lucas, and that he had referred to Mr. Lucas as, quote, flake [sic] that he did not trust, unquote.  Further, the witness stated that the victim had told him that the only reason he was going to sell Mr. Lucas the cocaine was that he needed the money badly and that he would net 200 [sic] dollars from the sale.

The victim's brother attested to the fact that the victim had been trying to, quote, put together, unquote, a cocaine deal with Mr. Lucas for the past week, and that it involved an ounce of cocaine.  In addition, he stated that he had heard his brother say that he did not trust Mr. Lucas.  Eventually the brother alerted officers to the fact that an individual identified as Michael McMahon, common spelling, had supplied his brother with the cocaine that was to be sold to Mr. Lucas.  McMahon was subsequently contacted and acknowledged that he had supplied the victim with cocaine on several occasions, usually in small amounts, and that on October 9th, 1982, the victim had asked him if he could get an ounce of cocaine.  McMahon stated that he had agreed to do so, but the following day he learned from the victim that the deal had not been completed because Mr. Lucas' partner had gone to get his portion of the money in larger bills, and as a result the deal would be consummated after work.

McMahon stated that until that time he was unaware of the identity of the buyer, and that he told the victim to cancel the deal because he did not like, quote, the sound of it, unquote, and that he did not trust Mr. Lucas.  McMahon explained that in the past Mr. Lucas had bought some cocaine from the victim and had failed to pay the full amount.  In addition, he stated that he knew Mr. Lucas did not have the money to buy an ounce of cocaine.  In addition, he maintained that he would never have agreed to provide the victim with the cocaine had he been made aware of the fact that Mr. Lucas was the buyer.

According to McMahon, the victim usually went to Mr. Lucas' house or Mr. Lucas would go to the victim's house to make the sales. He added that he could not think of any reason why the victim would go to an isolated location with Mr. Lucas. Finally, he stated that the victim generally carried cocaine, either in the glove compartment or in the compartment located in the driver's door of the vehicle, and that the cocaine which he had given the victim to sell to Mr. Lucas on that particular day was packaged in a clear cellophane bag.

In the meantime Mr. Lucas was contacted at his residence and he acknowledged that on October 10th, 1981, at approximately 5:00 p.m., he had met the victim for a beer at Pearl's Restaurant, common spelling. He added that he left the restaurant at approximately 5:30 p.m. and spent the remainder of the evening with his children. After he was informed that the victim had been found dead, Mr. Lucas admitted that he was supposed to have met the victim to buy some cocaine from him, but that he was unable to raise the money and was unable to locate a friend who was supposed to go into the deal with him. He stated that, as a result, he met the victim at the prearranged restaurant and told him what had transpired. Officers then obtained permission from Mr. Lucas to examine his vehicle and traces of blood were located on it. Mr. Lucas claimed that he had hit a dog a few days before, but later stated, quote, I might as well tell you the truth, unquote.

After being advised of his rights, Mr. Lucas related that he and the victim had arranged to meet at an industrial complex so that he, referring to himself, and a friend could buy an ounce of cocaine from the victim. Mr. Lucas stated, however, that as it turned out he could not locate his friend and could not raise the 1,900 dollars needed to purchase the cocaine. He stated that as a result he proceeded to the industrial complex to inform the victim that he could not buy the cocaine, and that when he arrived he noted that the victim was bleeding and had been shot. In parenthesis, at that point the investigating officer had not informed Lucas as to how the victim had been killed, end of parenthesis.

Mr. Lucas added that he became frightened and that he immediately left the location, and with regard to the blood in his vehicle, Mr. Lucas related that the victim had leaned on the car and that he, referring to himself, had tried to wash off the blood. Permission was obtained from Mr. Lucas to search his residence and he acknowledged ownership of a .22 caliber Derringer and a .44 caliber Magnum pistol, an antique .32 caliber pistol and a rifle. He maintained that there were no other weapons on the premises. The weapons in question were located along with .38 caliber ammunition and an empty holster for a two inch, .38 caliber pistol.

A search warrant was subsequently obtained and a two inch, .38 caliber pistol, which was determined to be the murder weapon, was

4

> located in Mr. Lucas' garage.  Also, several bags of marijuana and several vials of that was believed to be cocaine were retrieved from Mr. Lucas' residence.  In addition, five marijuana plants were seized from Mr. Lucas' backyard.

(Decision at consecutive pgs. 15-22.)

## ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues <u>de</u> <u>novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362

5

1  (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision
2  does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review
3  of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See
4  also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that
5  we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such
6  error, we must decide the habeas petition by considering de novo the constitutional issues
7  raised.").

8         The court looks to the last reasoned state court decision as the basis for the state
9  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned
10 state court decision adopts or substantially incorporates the reasoning from a previous state court
11 decision, this court may consider both decisions to ascertain the reasoning of the last decision.
12 Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court
13 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal
14 habeas court independently reviews the record to determine whether habeas corpus relief is
15 available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle
16 v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not
17 reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the
18 AEDPA's deferential standard does not apply and a federal habeas court must review the claim
19 de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).
20 II.  Petitioner's Claim
21        Petitioner claims that the Board's failure to find him suitable for parole at the May
22 16, 2007, suitability hearing violated his right to due process.  (Form Pet. at 5-5e.)  He argues
23 that there was insufficient evidence presented at the hearing indicating that he posed an
24 unreasonable risk of danger to society if released from prison.  (Id.)  Petitioner also argues that
25 the Board's continued use of his commitment offense alone as "some evidence" of unsuitability
26 violates his right to due process.  (Id. at 5, 5c-5e.)  He contends that his offense "has little, if any,

6

predictive value for future criminality." (Id. at 5c.)

## A. Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. One alleging a due process violation must first demonstrate that he was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002) (McQuillion I).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws. Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." McQuillion I, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

California's parole scheme gives rise to a cognizable liberty interest in release on parole, even for prisoners who have not already been granted a parole date. Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion I, 306 F.3d at 903; see also In re Lawrence, 44 Cal. 4th 1181, 1204, 1210, 1221 (2008). Accordingly, this court must examine whether California provided the constitutionally-required procedural safeguards when depriving petitioner of a protected liberty interest and, if not, whether the state courts' conclusion that it did was contrary to or an unreasonable application of clearly established federal law.

In this regard, it is clearly established federal law that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in

a parole release date if the Board's decision is not supported by "some evidence in the record." Superintendent v. Hill, 472 U.S. 445, 457 (1985); Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007); Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915. "The 'some evidence' standard is minimally stringent," and a decision will be upheld under that standard if there is any evidence in the record that could support the conclusion reached by the factfinder. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)). See also Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the board's decision must have some indicia of reliability." Jancsek v. Or. Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). See also Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992). Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the conclusion reached. Id.

When assessing whether a state parole board's suitability decision was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851. Therefore, this court must:

> look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" in [petitioner's] case constituted an unreasonable application of the "some evidence" principle articulated in Hill.

(Id.)

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal. 4th 1061, 1078 (2005). The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release

8

date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal. 4th at 1202 (citing California Penal Code § 3041(a)). A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ." Cal. Penal Code § 3041(b).

In order to carry out the mandate of California Penal Code § 3041, the Board must determine "whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole." In re Lawrence, 44 Cal. 4th at 1202 (citing California Code Regs., tit. 15, § 2281(a)). In doing so, the Board must consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs., tit. 15, § 2281(b).

The applicable regulation identify circumstances that tend to show suitability or unsuitability for release. Cal. Code Regs., tit. 15, § 2281(c) & (d). The following circumstances have been identified as tending to show that a prisoner is suitable for release: (1) the prisoner has no juvenile record of assaulting others or committing crimes with a potential of personal harm to victims; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has performed acts that tend to indicate the presence of remorse or has given indications that he understands the nature and magnitude of his offense; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner's criminal behavior resulted from

9

having been victimized by battered women syndrome; (6) the prisoner lacks a significant history of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) institutional activities indicate an enhanced ability to function within the law upon release. Cal. Code Regs., tit. 15, § 2281(d).

The following circumstances have been identified as tending to indicate unsuitability for release: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner had a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner's crime was a sadistic sexual offense; (5) the prisoner had a lengthy history of severe mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct in prison. Cal. Code Regs., tit. 15, § 2281(c). Factors to consider in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or cruel manner include: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. Id. § 2281(c)(1)(A) - (E).

The overriding concern in determining parole suitability in California is public safety. Dannenberg, 34 Cal. 4th at 1086. This "core determination of 'public safety' . . . involves an assessment of an inmates current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in original). See also Cal. Code Regs. tit. 15, § 2281(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.") Accordingly, under California law,

/////

> when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.

Lawrence, 44 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (2002); Dannenberg, 34 Cal. 4th at 1071; and In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

In recent years the Ninth Circuit Court of Appeals has concluded that, given the liberty interest that California prisoners have in release on parole, a continued reliance upon an unchanging factor to support a finding of unsuitability for parole may, over time, constitute a violation of due process. The court has addressed the issue in three significant cases, each of which will be discussed below.

First, in Biggs, the Ninth Circuit Court of Appeals recognized that a continued reliance on an unchanging factor to deny parole, such as the circumstances of the offense, could at some point result in a due process violation.[1] While the court in Biggs rejected several of the reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three: (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy. Biggs, 334 F.3d at 913. However, the court in Biggs cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to committing that offense in denying parole could, at some point, violate due process. In this regard, the court observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct

---

[1] That holding has been acknowledged as representing the law of the circuit. Irons, 505 F.3d at 853; Sass, 461 F.3d at 1129.

> would raise serious questions involving his liberty interest in parole.

Id. at 916. The court in Biggs also stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs. 334 F.3d at 917.

In Sass, the Board found the petitioner unsuitable for parole at his third suitability hearing based on the gravity of his offenses of conviction in combination with his prior offenses. 461 F.3d at 1126. Citing the decision in Biggs, the petitioner in Sass contended that reliance on these unchanging factors violated due process. The court disagreed, concluding that these factors amounted to "some evidence" to support the Board's determination and providing the following explanation for its holding:

> While upholding an unsuitability determination based on these same factors, we previously acknowledged that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and *could* result in a due process violation." Biggs, 334 F.3d at 917 (emphasis added). Under AEDPA it is not our function to speculate about how future parole hearings could proceed. Cf. id. The evidence of Sass' prior offenses and the gravity of his convicted offenses constitute some evidence to support the Board's decision. Consequently, the state court decisions upholding the denials were neither contrary to, nor did they involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

Id. at 1129.

In Irons, the Ninth Circuit sought to harmonize the holdings in Biggs and Sass, stating as follows:

> Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in Sass precludes us from accepting

/////

12

> Irons' due process argument or otherwise affirming the district court's grant of relief.
>
> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in <u>Biggs</u>, <u>Sass</u>, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. <u>Biggs</u>, 334 F.3d at 912; <u>Sass</u>, 461 F.3d at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.
>
> Furthermore, we note that in <u>Sass</u> and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. <u>Biggs</u>, 334 F.3d at 917.

<u>Irons</u>, 505 F.3d at 853-54.[2]

B. <u>Analysis</u>

In addressing the factors it considered in reaching its May 16, 2007 decision that petitioner was then unsuitable for parole, the Board in this case stated as follows:

/////

---

[2] The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety. <u>In re Lawrence</u>, 44 Cal. 4th at 1218-20 & n. 20. Additionally, a recent panel of the Ninth Circuit in <u>Hayward v. Marshall</u>, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc. <u>Hayward v. Marshall</u>, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in <u>Hayward</u> is no longer citable precedent.

1        PRESIDING COMMISSIONER KUBOCHI:  Okay, thank you.  It is 1:30 p.m. and we're back on record to announce the decision in the Subsequent Parole Consideration of Daniel Lucas.  Mr. Lucas, we've considered all the evidence received from the public and we are denying parole at this time.  We are finding you not suitable.  And it's in a couple of specific areas.  It is very important for you to address these because they're very pivotal.  And based on the issues that I'm going to address that we would find that you are not suitable and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

          In this case, as you're well aware, this was just a senseless, calculated murder, in which you concocted a plan to rob a drug dealer.  You got him in an isolated area and you armed yourself.  It was just carried out in just a cruel and callous manner in that, by my analysis of it, you could have gotten the cocaine without killing this guy.  And we listened to you and we agree with you that your addiction was just out of control.  It had changed your central nervous system and it changed who you were as a person.

          And what we'd like to see from you in analyzing everything, is clearly you've had a long-term participation in NA.  I think you, without doubt, understand the causation factors, you've still got to work on a little bit about the anger management, I think a little bit more.  Because there's going to be a lot of frustration when you get out there, and we'd like to see you broaden that self-help/self-study in learning how to deal with impulse control issues, anger management.  Supplement that by reading books, you're a highly intelligent person.

          But without a doubt your addiction is significant in it and listening to you we understand being locked-up you can't control everything, but we'd like to see you get an NA sponsor, where that person could write to the Board and document the sponsorship and the contacts with you in the next year.

          INMATE LUCAS:  Yeah, it's difficult where I am.

          PRESIDING COMMISSIONER KUBOCHI:  I understand that, but we'd like to see you work on it because the psychologist, for the most part, wrote a very favorable report, but relapsed in looking at the prior reports.  It's just hand-in-glove with the addiction, relapse and relapse prevention.  Commissioner Hernandez was impressed by the package on relapse prevention that you presented, but at least try to make the effort.  Because as Commissioner Hernandez pointed out, it would reassure the Board of Parole Hearings if you had that bridge person.

          INMATE LUCAS:  Well, then I'll push for that.

/////

1   PRESIDING COMMISSIONER KUBOCHI: Okay, really push for it. And the reason is, and personally what I would recommend also is the idea with your son is good, but please try to have him document a little more information concerning his business.

INMATE LUCAS: Okay.

PRESIDING COMMISSIONER KUBOCHI: Have his business license, etcetera. Because, let me tell you, once a month the Board sits in Sacramento in what they call as a group, all the Commissioners. This month in particular one person had his parole revoked – I mean rescinded. Because it turns out his plan didn't pan out, because they send out investigators to check out everything. So, your son is legit, he's been listed for two years in a row, but I think it would benefit everybody if he put in some of his financial information. He doesn't have to send in any tax forms, none of that privileged stuff, but how long he's been in business, how long he's had his business license, the type of income that he has, so that your presence wouldn't be a financial strain in the event that he had to support you for a year or so.

INMATE LUCAS: Okay.

PRESIDING COMMISSIONER KUBOCHI: Okay. Build that up a little bit better, because right now your son and not having that sponsor is your sole bridge back into the free world. You're already highly skilled, we're not asking you to do any more of that stuff. And part of what Commissioner Hernandez evaluated was you did have 115s long ago. So, the period of where that drug addiction had negatively impacted your personality was just more then the day of the murder. You notice the diversion issue before the murder, and so, yeah, you're dealing with a long-term addiction and the severity of it, you need to build that safety net a little bit stronger.

INMATE LUCAS: Okay.

PRESIDING COMMISSIONER KUBOCHI: All right? We'd like to see you continue to maintain all your gains. We'd like you to continue in your therapy, self-help, self-study, so that you can face, discuss and understand what all types of stress that you will encounter in a nondestructive manner. Because we're not saying violent, but just self-destruction is what happens with alcohol or drugs, especially to a recovering addict. And until progress is made in this area you will continue to be unpredictable and a threat to others in view of the life crime. And so we'd like to see you maintain your gains and we'd like to see you solidify these parole plans, including the NA a little bit stronger.

INMATE LUCAS: Okay.

/////

1     PRESIDING COMMISSIONER KUBOCHI:  Because, like I said, I looked at every psychologist report, and everybody concurs you've made tremendous strides.  You're likeable, you have skills, no one's doubting your ability to become self-sufficient, but relapse to somebody with that addiction can be devastating and in a real quick amount of time.

    INMATE LUCAS:  I agree with that.  I'm going to push for the sponsor.  In fact, I've met some guys that I talk to frequently, we're all trying to get a 12 Step program together, in addition to the NA, 12 Step, you know, so we can do the steps, then we can confer with [sic].

    PRESIDING COMMISSIONER KUBOCHI:  Exactly, exactly.  Because the more non-inmate people that work with you can attest to the strides that you have achieved.  Okay, Commissioner, anything to add?

    DEPUTY COMMISSIONER HERNANDEZ;  Yes, I'd like to wish him the best of luck and note also too that you have made some great strides in a positive direction.  I hope that you can maintain that positive progress.  But one thing that I would like to suggest with respect to the NA sponsor is that when you're looking for someone, try and focus in on someone who has five years or more sobriety, and they're a real solid, positive person, in that I know – I know that's asking for a lot, but, you know, when I look at you and your record, that's something that may be a serious lifeline for you.

    INMATE LUCAS:  Yeah.  I believe that.

    DEPUTY COMMISSIONER HERNANDEZ:  That's why I'm suggesting that and I'm trying to give you the best case scenario here.

    INMATE LUCAS:  Yeah, see that's the thing that really threw me on all of this, you know, this guy, he was recommended by the NA sponsor that comes here, you know, the outside person.  This guy was recommended to me and he had eight years of sobriety, right?  And then we were together for about, you know, four months and then all of a sudden, I did this plan I was telling you about and none of the outside people have seen him since.

    DEPUTY COMMISSIONER HERNANDEZ:  You never heard what happened?

    INMATE LUCAS:  I don't know if he got injured.  He was right here in the Stockton program and then he went to San Francisco to do some work and nobody has seen him since.  It's just, it's crazy.

    DEPUTY COMMISSIONER HERNANDEZ:  Yeah, well, we didn't hold that against you, because you had no control over it.

> It's simply we'd like that lifeline reestablished, not necessarily that person —

(Answer, Ex. 1 (Decision) at 1-7.)

After taking into consideration the Ninth Circuit decisions in <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u>, and for the reasons set forth below, this court concludes that petitioner is not entitled to federal habeas relief with respect to his due process challenge to the Board's May 1, 2007 decision denying him parole. First, and perhaps most importantly, at the time of the challenged parole suitability hearing, petitioner had not yet served the minimum number of years required by his sentence. Petitioner was sentenced to 27 years-to-life in prison in 1982 and the parole hearing at issue was held twenty-five years later, in 2007. Pursuant to the holding in <u>Irons</u>, even if the decision was based on unchanging factors involving his commitment offense, petitioner's right to due process was not violated when he was deemed unsuitable for parole prior to the expiration of his minimum term. <u>Irons</u>, 505 F.3d at 665.

Further, the Board's decision that petitioner was unsuitable for parole in 2007 and that his release would unreasonably endanger public safety was supported by "some evidence" that bore "indicia of reliability." <u>Jancsek</u>, 833 F.2d at 1390. Specifically, the Board relied on the nature of petitioner's commitment offense, petitioner's history of drug abuse, and petitioner's uncertain parole plans with regard to relapse prevention programs. These factors cited by the Board constitute "some evidence" supporting the Board's decision that petitioner was not yet suitable for release on parole. <u>Sass</u>, 469 F.3d at 1129; <u>Irons</u>, 505 F.3d at 665. The court acknowledges that there are circumstances in this case that indicate petitioner is suitable for release on parole. However, the case has not yet reached the point where a continued reliance on an unchanging factor such as the circumstances of the offense in denying parole has resulted in a due process violation. Accordingly, petitioner is not entitled to federal habeas relief on his claim that the Board's failure to find him suitable for parole at his May 1, 2007 hearing violated his right to due process.

CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 9March 5, 201051 F.2d 1153 (9th Cir. 1991).

DATED: March 17, 2010.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8:
lucas1203.hc

18